MATT O'MALLEY (SBN 272802)
PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
2825 Dewey Rd # 207
San Diego, CA 92106
Ph: (619) 758-7743
Email: matt@sdcoastkeeper.org

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION, a non-profit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>CEMEX CONSTRUCTION MATERIALS PACIFIC, LLC., a Delaware corporation,<br><br>Defendant. | Civil Case No. **'20 CV 1659 JAH NLS**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)** |

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.     On June 2, 2020, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Defendant CEMEX Construction Materials Pacific, LLC, dba Palomar Transit Mix ("CEMEX" or "Defendant") as owner and operator of the Facility located at 849 W. Washington Ave., Escondido, CA 92025 ("CEMEX Facility" or "Facility"), regarding Defendant's violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.     Plaintiffs also sent the Notice Letter to the registered agents for Defendant, the Acting Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

4.     More than sixty (60) days have passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is

1   diligently prosecuting an action to redress the violations alleged in the Notice Letter and

2   in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior

3   administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4        5.    Venue is proper in the Southern District of California pursuant to 33 U.S.C.

5   § 1365(c)(1) because the source of the violations is located within this judicial district.

6   **II.**    **INTRODUCTION**

7        6.    Plaintiffs seek relief for Defendant's substantive and procedural violations

8   of the IGP and the CWA resulting from its activities at the CEMEX Facility.

9        7.    Specifically, Defendant has discharged and continues to discharge polluted

10  storm water from the CEMEX Facility to downstream waters and groundwater including

11  Escondido Creek, the San Elijo Lagoon, and the Pacific Ocean (collectively "Receiving

12  Waters") in violation of the express terms and conditions of the Clean Water Act, 33

13  U.S.C. §§ 1301, 1342.

14       8.    Defendant has also violated and continues to violate the filing, monitoring,

15  reporting, discharge and management practice requirements, and other procedural and

16  substantive requirements of the IGP. These are ongoing and continuous violations of the

17  Clean Water Act and the IGP.

18       9.    With every rainfall event, hundreds of millions of gallons of polluted

19  rainwater, originating from industrial facilities like the CEMEX Facility flow into storm

20  drain systems, local tributaries, and the Receiving Waters.

21      10.    Among the Receiving Waters are ecologically sensitive areas providing

22  essential habitat for dozens of fish, hundreds of bird, and numerous mammal species, as

23  well as vital macro- and micro-invertebrate species which are an important link in the

24  food web between the producers (leaves, algae) and higher consumers such as fish.

25      11.    This discharge of polluted storm water and non-storm water from the

26  Facility causes and/or contributes to the impairment of downstream Receiving Waters

27  and compromises or destroys their Beneficial Uses.

28  /././

12.     Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

13.     The polluted discharges from the CEMEX Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

## III.     PARTIES

14.     CEMEX Construction Materials Pacific, LLC, dba Palomar Transit Mix, is an active Delaware corporation and is the Owner and/or Operator of the Facility.

15.     Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

16.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's coastal communities. CERF was established to advocate for the protection and

enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

17.     Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies, among other activities.

18.     Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

19.     The violations of the IGP and CWA at the CEMEX Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

20.     The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

21.     An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

IV.     <u>**LEGAL BACKGROUND**</u>

    **A.     The Clean Water Act.**

22.     The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

23.     Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

24.     "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

25.     The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26.     The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2.

27.     The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

28.     The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

**B.     California's IGP.**

29.     Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

30.     California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

31.     The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

*/././*

32. Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

33. In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, Finding 2; 2015 Permit § I.A.12; 2020 Permit § I.A.12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. 1997 Permit, Finding 3; 2015 & 2020 Permit § I.A.17.

34. Violations of the IGP are violations of the Clean Water Act. 1997 Permit § C.1; 2015 & 2020 Permit § XXI.A.

**C.    The IGP Discharge Prohibitions.**

35. The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." 2015 & 2020 Permit § III.A.

36. The Discharge Prohibitions forbid the direct or indirect discharge of liquids or materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit § A.1; 2015 & 2020 Permit § III.B.

37. These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. 1997 Permit § A.2; 2015 & 2020 Permit § III.C.

38. The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. 2015 & 2020 Permit § III.D.

39.     The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

40.     Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

### D.      The IGP Effluent Limitations.

41.     The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

42.     Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

43.     Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

44.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* 2015 MSGP Fact Sheet at 50.

45.     Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

/././

46.     The 2015 MSGP freshwater EPA Benchmarks include, but are not limited to: 100 mg/L for TSS; 15 mg/L for Oil and Grease; pH is 6.0–9.0 s.u; .68 mg/L for N+N; .75 mg/L for aluminum; .014 mg/L for copper; .082 mg/L for lead; .005 mg/L for selenium; and .12 mg/L for zinc. 2015 MSGP Fact Sheet at 55–56.

**E.     The IGP Receiving Water Limitations.**

47.     The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 1997 Permit § C.1; 2015 & 2020 Permit § VI.B.

48.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

49.     The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. 1997 Permit § C.2; 2015 & 2020 Permit § VI.A.

50.     Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33 U.S.C. § 1313(c)(2)(A).

51.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

52.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act section 303. 40 C.F.R. § 131.

53.     The Beneficial Uses for Escondido Creek downstream from the CEMEX Facility's include: municipal and domestic supply; agricultural supply; potential industrial service supply; contact water recreation; non-contact water recreation; warm

freshwater habitat; cold freshwater habitat; and wildlife habitat. Basin Plan, Table 2-2.

54.     The Beneficial Uses for the San Elijo Lagoon include: contact water recreation; non-contact water recreation; wildlife habitat; preservation of biological habitats of special significance; estuarine habitat; marine habitat; spawning, reproduction, and/or early development; migration of aquatic organisms; and rare, threatened, or endangered species. *Id*., Table 2-3.

55.     Pacific Ocean Beneficial Uses include: industrial service supply; navigation; contact water recreation; non-contact water recreation; commercial and sport fishing; wildlife habitat; preservation of biological habitats of special significance; marine habitat; migration of aquatic organism; spawning, reproduction, and/or early development; shell harvesting; aqua culture; and rare, threatened, or endangered species. *Id.*

56.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

57.     According to the 2016 303(d) List, Escondido Creek is impaired for benthic community effects, bifenthrin, DDT, indicator bacteria (such as enterococcus and E. coli), malathion, manganese, nitrogen, phosphate, selenium, sulfates, total dissolved solids, and toxicity.

58.     Data collected by Coastkeeper from 2008 to 2018, publicly available on the California Environmental Data Exchange Network ("CEDEN"), indicates Escondido Creek is also impaired for phosphorus. Additional Receiving Water monitoring data in CEDEN indicates Escondido Creek is also impaired for iron, zinc, and phosphorus.

59.     According to the 2016 303(d) List, the San Elijo Lagoon is impaired for eutrophic conditions, indicator bacteria, sedimentation/siltation, and toxicity.

60.     According to the 2016 303(d) List, the Pacific Ocean Shoreline, at Cardiff State Beach at San Elijo Lagoon is impaired for indicator bacteria.

61.     Polluted discharges from industrial facilities, such as the CEMEX Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent wildlife.

62.    The following WQS are established by the Basin Plan for Escondido Creek: nitrogen, 1.0 mg/L; phosphorus, 0.1 mg/L; iron, 0.3 mg/L; manganese, 0.05 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5." Basin Plan at 3-13; 3-26.

63.    The CTR includes numeric criteria set to protect human health and the environment. Based on 100mg/L hardness, the CTR maximum freshwater concentrations include: copper, 0.013 mg/L; lead, 0.065 mg/L; selenium, 0.005 mg/L; zinc, 0.12 mg/L. 40 C.F.R. § 131.38.

64.    Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 1997 Permit § C.2; 2015 & 2020 Permit § VI.A.

**F.    The IGP Storm Water Pollution Prevention Plan Requirements.**

65.    Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). 1997 Permit §§ A.1.a, E.2; 2015 & 2020 Permit §§ X.A–B.

66.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. 1997 Permit § A.2; 2015 & 2020 Permit § X.

67.    The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and

authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. 1997 Permit §§ A.1–10; 2015 & 2020 Permit §§ X.A–I.

68.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 1997 Permit §§ A.9–10; 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The 2015 and 2020 Permits require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permit § X.B.2.

69.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. 1997 Permit §§ A.9.a–c; 2015 & 2020 Permit § XV.

## G.     The IGP Monitoring and Reporting Requirements.

70.     Permittees must develop and implement a monitoring implementation plan ("MIP"). 1997 Permit §§ B.1–2, E.3; 2015 & 2020 Permit, §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit §§ B.2.; 2015 Permit §§ I.J.55–56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69–70.

71.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 1997 Permit §§ B.2.a, B.2.d; 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

72.     The IGP requires dischargers conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 1997 Permit §B.4.a; 2015 & 2020 Permit § XI.A.1.

73.     Section B.5.a of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *Id.* Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *Id.*

74.     Section XI.B.1 of the 2015 and 2020 Permits require sampling from a qualifying storm event ("QSE"), which is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no discharge from any drainage area.

75.     The 2015 Permit defines Reporting Year as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Section XI.B.2 of the 2015 and 2020 Permits require dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30).

76.     Section XI.B.11 of the 2015 and 2020 Permits, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results.

77.     The 1997 Permit required dischargers to analyze each sample for at least pH, specific conductance, TSS, and total organic carbon, while the 2015 and 2020 Permits require dischargers to analyze samples for TSS, O&G, and pH, at a minimum.

78.     The 1997 Permit further required dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

79.     The 2015 and 2020 Permits require dischargers to analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants.

80.     The 2015 and 2020 Permits also require dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads.

81.     Section B.14 of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include (1) a summary of visual observations and sampling results, (2) an evaluation of the visual observations and sampling and analysis results, (3) laboratory reports, (4) the annual comprehensive site compliance evaluation report specified in Section A(9), (5) an explanation of why a facility did not implement any activities required, and (6) the records specified in Section B.13.i. *Id.*

82.     Section C.11.d of the 1997 Permit required facility operators to report any incidence of noncompliance with the Industrial Permit at the time monitoring reports are submitted. Reports of noncompliance must contain (1) a description of noncompliance and its cause, (2) the period of noncompliance, including exact dates and times, and if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (3) steps taken or planned to reduce and prevent recurrence of the noncompliance.

83.     The 2015 and 2020 Permits require dischargers to submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

84.     The IGP requires that all reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and

1     certified for accuracy. 1997 Permit § C.9; 2015 & 2020 Permit § XXI.K.

2     **V.**     **FACTUAL BACKGROUND**

3         **A.**     **Facility Site Information, Industrial Activities, and Pollutant Sources.**

4         85.     The four-acre CEMEX Facility first obtained IGP coverage to conduct

5 industrial operations on March 12, 2015. The Facility submitted its most recent Notice of

6 Intent ("NOI") to obtain IGP coverage under the 2015 Permit on March 12, 2019 ("2019

7 NOI"), under Waste Discharge Identification Number 9 37I025320.

8         86.     The Facility Standard Industrial Classification ("SIC") code is 3273 (ready-

9 mixed concrete). General categories of industrial activities at the Facility include concrete

10 production, mobile equipment operation, fueling and maintenance, hazardous material

11 handling and storage, and various dust and particulate generating activities.

12         87.     According to the 2020 SWPPP, the primary industrial activities conducted at

13 the CEMEX Facility are concrete production, mobile equipment operation, fueling, and

14 maintenance, and vehicle and mobile equipment parking. 2020 SWPPP § 6.1.

15         88.     The 2020 SWPPP states that concrete production involves transporting

16 aggregate material (consisting of sand and gravel) to the batch plant via conveyor belt

17 and loading the aggregate into concrete haul trucks.

18         89.     Cement and fly ash are transported via pipes to the batch plant, and "[t]hese

19 materials, water, and (if applicable) admixtures are added to concrete haul trucks which

20 mix the ingredients together to produce concrete," which is thereafter hauled offsite. *Id*.

21         90.     The Facility receives and stores large quantities of aggregate, cement, and

22 fly ash at the Facility. Hundreds of tons of aggregate, cement, and fly ash, and an average

23 of 5,000 gallons of admixtures may be in process or in storage at any one time. *Id*.

24         91.     According to the 2020 SWPPP, excess concrete not used by customers may

25 be returned to the Facility, taken out of the mixer trucks, and temporarily stored.

26         92.     The Facility handles and stores significant quantities of waste concrete

27 material. *Id*. § 6.1. "After the concrete dries, it is hauled off site and recycled to make

28 base material." *Id*.

93.     According to the 2020 SWPPP, "acidic truck wash material is used to wash the mixer trucks and prevent the accumulation of concrete on the truck" in the truck wash out area. *Id*.

94.     According to the 2020 SWPPP, the Facility also uses mobile equipment to load aggregate and sweep the yard. This mobile equipment is fueled and maintained onsite.

95.     The 2020 SWPPP identifies numerous industrial materials that are stored, handled, and/or otherwise used at the facility, including: aggregate materials composed of rock, sand, and gravel; cement; fly ash; concrete admixtures; diesel fuel; lubricating oils such as motor oil, hydraulic oil, and transmission fluid; and other materials such as antifreeze, brake cleaner, grease, and battery acid. *Id*., §§ 5.0, 6.1.2; Table 1. "Hazardous materials are handled throughout the site." 2020 SWPPP § 6.2.1.

96.     The 2020 SWPPP acknowledges that concrete production, mobile equipment operation, fueling and maintenance, material handling and storage, and dust and particulate generating activities can contribute pollutants to the Facility's storm water discharges.

97.     Despite acknowledging the Facility's numerous industrial activities related to batch concrete production, the 2020 SWPPP states that the only pollutants likely to be present in the Facility's storm water discharges include O&G, iron, pH affecting substances, and TSS. 2020 SWPPP §§ 6.1.1; 7.0.

98.     The 2020 SWPPP states that the industrial activities most likely to contribute pollutants to storm water and non-storm water are concrete production via spills and leaks of aggregate material, cement, fly ash, and returned concrete; mobile equipment operations via spills from equipment failure, fueling, and waste materials generation during maintenance activities; and hazardous material storage via spills from loading, unloading, storage, transfer, and use. 2020 SWPPP § 7.0.

99.     The Facility's concrete production activities also generate dust from loading aggregate, fly ash, and cement into mixing drums to produce concrete. *Id*. § 6.3.

100.   The 2020 SWPPP acknowledges that these dust and particulate generating activities can result in pollutant deposition within the Facility boundary and can affect storm water pollution throughout the Facility. *Id*. §§ 3.2, 6.3, Table 3.

101.   The 2020 SWPPP specifically admits that the pathways through which pollutants may be exposed to storm water at the Facility includes "[d]ust and particulate emissions that are deposited within facility boundaries." *Id.* 7.0.

102.   The 2020 SWPPP claims that these dust and particulate discharges result only in emissions of "natural crustal material," and that cement dust "may create high pH in water." *Id.* § 6.3.

103.   Though the SWPPP claims the only pollutants likely to be present in storm water discharges include O&G, iron, pH affecting substances, and TSS, Plaintiffs are informed, believe, and thereon allege the Facility's concrete production activities produce additional pollutants, including but not limited to phosphorus, nitrogen, zinc, copper, lead, arsenic, mercury, and cadmium.

104.   Cement dust and fly ash are harmful, toxic, and carcinogenic. Fly ash frequently contains lead, arsenic, mercury, and cadmium. Cement dust in the United States commonly contains mercury, copper, chromium, hexavalent cadmium, nickel, manganese, lead, and iron. Many of these pollutants are considered toxic under the CTR, and all are regulated by the IGP and Clean Water Act. 40 C.F.R. § 131.38.

105.   The 2020 SWPPP admits that cement dust pollution is very difficult to control. "Cement dust is very fine and it is difficult to sweep up to a level that does not adversely impact storm water." 2020 SWPPP § 7.0.

106.   Plaintiffs are informed, believe, and thereon allege that nitrogen and phosphorus are also commonly present in storm water discharges at ready mix concrete batch plants.

107.   Plaintiffs are informed, believe, and thereon allege, based on evidence from the City of Escondido and direct observations, that spills and leaks of industrial materials further contribute to the Facility's storm water pollution, in direct contradiction to the

2020 SWPPP's claim that the Facility has not experienced a spill or leak of industrial materials or hazardous substances in the past five years. *See* 2015 SWPPP § 6.4.

108.   A City of Escondido storm water inspection report dated January 28, 2020, states that cement was discharged into the street by a truck or trucks in violation of outdoor operation BMPs. The City of Escondido inspection report also directed the CEMEX Facility to clean up all cement material, and to "[k]eep cement out of the storm drains."

109.   Plaintiffs are informed, believe, and thereon allege, based on inspection records, photographs, and direct observations, that process water, wash water, and other non-storm water at the Facility frequently commingle with storm water.

110.   On March 10, 2020 and April 10, 2020, representatives from CERF and Coastkeeper observed the Facility, and on both occasions the northern portion of the Facility was flooded, and the flood water stretched from the storm water basin to the batch plant. Trucks and other vehicles must necessarily pass through the flooded area to enter or exit the Facility.

111.   On April 10, 2020, the vast majority of the northern portion of the Facility was flooded, and water was observed discharging from Discharge Point 1.

112.   Plaintiffs are informed, believe, and thereon allege the Facility lacks adequate BMPs to prevent the commingling of storm water and any wash water or other process water commonly present in the northern end of the Facility.

113.   Based on the foregoing, Plaintiffs are informed, believe, and thereon allege that numerous additional pollutants associated with industrial activity are present in the Facility's storm water discharges, including aluminum, arsenic, barium, beryllium, copper, chromium, hexavalent chromium, cadmium, cobalt, lead, nickel, manganese, mercury, zinc, selenium, nitrogen, and phosphorus.

114.   Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the CEMEX Facility either outdoors without adequate cover to prevent storm water and non-storm

water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

115.   Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring indoors or under partial shelter at the Facility regularly escape via dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

116.   Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

117.   Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

118.   Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

119.   Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and wash water, process water, and other non-storm water commingle with storm water, and thus all discharges from the Facility are regulated under the IGP.

120.   Plaintiffs are informed, believe, and thereon allege that industrial activities at the CEMEX Facility generate significant amounts of numerous pollutants. During rain

events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

121.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

122.   Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continues to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

123.   Plaintiffs are informed, believe, and thereon allege that the CEMEX Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

124.   Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

125.   Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the CEMEX Facility impact Coastkeeper's and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.      Facility Drainage Areas, Storm Water Flow, and Discharge Locations.**

126.   The 2020 SWPPP states that the four-acre site has only one drainage area. "Drainage Area 1 (DA1) includes the batch plant, aggregate storage areas, maintenance shop, fueling area, wash out area, and storage areas." 2020 SWPPP § 4.1.

127.   According to the 2020 SWPPP, storm water in the northeast portion of the facility collects around the batch plant and is reused in concrete batching operations, while storm water in the northwest portion of the facility flows into a basin. *Id*.

128.   According to the 2020 SWPPP, water from the basin is pumped to the batch

plant and reused in Facility operations. However, the SWPPP further states that when the basin is overwhelmed, it discharges to the west at Discharge Point 1, and that such discharges will be sampled at Sample Point 1. *Id*.

129.   According to the 2020 SWPPP, storm water that falls in the southern part of the Facility "flows to the wash out area where it is captured and reused in wash out operations." *Id*. The SWPPP does not state where storm water would flow if the wash out area were to become overwhelmed.

130.   Although the 2020 SWPPP also claims that the Facility's perimeter is lined with berms that contain storm water on site, this claim is contradicted by the SWPPP's own admission that the Facility discharges at Discharge Point 1 when the basin becomes overwhelmed.

131.   Defendant has failed to state any specific capacity of the northwest basin.

132.   Plaintiffs are informed, believe, and thereon allege the Facility's retention capacity is modest as compared to the Facility's impervious surface area, and that as such, the CEMEX Facility will discharge storm water during most QSEs.

133.   Plaintiffs are informed, believe, and thereon allege, based on City of Escondido inspection photographs and direct observations, that the basin contains only a modest capacity compared to the Facility's acreage that is exposed to storm water.

134.   Plaintiffs are informed, believe, and thereon allege the Facility's basin is likely to regularly discharge storm water during precipitation events – indeed such discharge was observed by Coastkeeper representatives on April 10, 2020.

135.   Plaintiffs are informed, believe, and thereon allege, based on publicly available information and direct observations, that the Facility is bordered on its western boundary by a yard that is owned and operated by the City of Escondido.

136.   Plaintiffs are informed, believe, and thereon allege, based on publicly available information and direct observations, that storm water and non-storm water discharged from Discharge Point 1 flows into this adjacent yard on the western boundary of the Facility. This water thereafter flows south-southeast until it is discharged into a

City of Escondido flood control channel.

137.  This City of Escondido storm water drainage channel borders much of the Facility's eastern boundary.

138.  The 2020 SWPPP's claim that berms contain storm water onsite is further undermined by a City of Escondido document stating that the Facility had illegally discharged water from the property into the flood control channel adjacent to the eastern boundary of the Facility on January 4, 2018. City of Escondido, Environmental Programs Stormwater Inspections Report, File Number 1131, Apr. 16, 2018.

139.  City of Escondido reports state that these discharges were caused by a broken pipe along the eastern side of the CEMEX Facility "which recirculates water from the back end of their yard back into their cement production." *Id*.

140.  The Facility's discharges into the adjacent flood control channel indicate that water can discharge from the eastern side of Facility and enter the adjacent drainage channel, where it thereafter flows to Escondido Creek.

141.  Storm water and non-storm water discharges from the Facility flow into the City of Escondido drainage channels, which flows downstream to Escondido Creek, San Elijo Lagoon, and eventually to the Pacific Ocean via the mouth of the lagoon at Cardiff State Beach.

C.  **The CEMEX Facility Discharges Contaminated Storm Water in Violation of the IGP.**

142.  Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the CEMEX Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

143.  Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the United States and therefore the IGP properly regulates discharges to those waters.

144.  Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the CEMEX Facility violate the Discharge Prohibitions,

Effluent Limitations, and Receiving Water Limitations of the IGP.

**1. Discharges of Polluted Storm Water from the CEMEX Facility Violate IGP Discharge Prohibitions.**

145.   Plaintiffs are informed, believe, and thereon allege the CEMEX Facility has discharged unauthorized non-storm water discharges ("NSWD") in violation of the IGP. *See* 1997 Permit § A.1; 2015 Permit § III.B; 2020 Permit § III.B.

146.   City of Escondido records demonstrate that on January 4, 2018, the Facility illegally discharged non-storm water into the flood control channel that runs along the eastern side of the Facility. The discharges were caused by a broken pipe along the eastern side of the CEMEX Facility "which recirculates water from the back end of their yard back into their cement production." City of Escondido, Environmental Programs Stormwater Inspections Report, File Number 1131, Apr. 16, 2018. This NSWD is a clear violation of the Industrial General Permit.

147.   Plaintiffs are informed, believe, and thereon allege, based on numerous publicly available documents and direct observations, that the Facility uses non-storm water for several industrial applications including washing vehicles, rinsing mixing truck tires, reducing fugitive dust emissions, and washing out cement mixers.

148.   Plaintiffs are informed, believe, and thereon allege, based on photos and direct observations, that some process water is tracked throughout the Facility, and commingles with storm water which thereafter illegally discharges from the Facility. For example, publicly available images of the northwestern area of the Facility show non-storm water stretching from the batch plant to the northwestern basin during dry weather, indicating that this process or wash water will commingle with any storm water that may be retained in the northern area of the Facility.

149.   Coastkeeper and CERF also observed that a significant portion of the northern area of the Facility was flooded on March 10, 2020 and April 10, 2020, with ponded water reaching from the batch plant to the northwestern basin, in the exact location in which aforementioned publicly available images showed non-storm water

during dry weather. On April 10, 2020, Coastkeeper observed this commingled storm water discharging from the Facility at Discharge Point 1.

150.  Plaintiffs are informed, believe, and thereon allege Defendant has failed to develop and/or implement BMPs that would prevent these NSWDs from comingling and/or discharging from the Facility in violation of the IGP.

151.  Each time Defendant discharges prohibited non-storm water in violation of Discharge Prohibition III.B. of the Permit is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

152.  Plaintiffs are informed, believe, and thereon allege that the CEMEX Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 1997 Permit § A.2; 2015 & 2020 Permit § III.C.

153.  The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

154.  "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

155.  Plaintiffs are informed, believe, and thereon allege the Facility's discharges of polluted storm water have violated the IGP's Discharge Prohibition III.C.

156.  Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

157.  "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

/././

158.    Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

159.    Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the CEMEX Facility's discharges or to the downstream Receiving Waters.

160.    Plaintiffs are informed, believe, and thereon allege, based on inspection notes and photos from the City of Escondido and direct observations, that Defendant has violated and continues to violate Discharge Prohibition III.D of the 2015 and 2020 IGP by discharging pollutants in excess of water quality objectives.

161.    Plaintiffs are informed, believe, and thereon allege that the Facility has discharged storm water with concentrations of numerous pollutants in excess of the CTR standards and Basin Plan Water Quality Objectives in violation of the IGP.

162.    Defendant's failures to collect storm water samples in accordance with the IGP and to analyze such samples for all required pollutants, do not excuse the Facility's violations of the Discharge Prohibitions provisions of the IGP.

163.    Each time the CEMEX Facility discharges polluted storm water in violation of Sections III.B, III.C, or III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

164.    These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

### 2.    Discharges of Polluted Storm Water from the CEMEX Facility Violate IGP Effluent Limitations.

165.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm

water from the Facility. *See* 1997 Permit § B.3; 2015 & 2020 Permit § V.A.

166.   Google satellite images and City of Escondido inspection photos show milky colored process and/or wash water reaching from the batch plant to the storm water basin in the northern portion of the Facility during dry weather. City of Escondido inspection photos and notes further indicate that water is used for truck and tire washing, and that this wash water drains to the northwestern basin. The aforementioned images and photos also indicate that this water is tracked through the site, as well as off the site.

167.   Further, on March 10, 2020 and April 10, 2020, Coastkeeper and CERF directly observed pooled water in this same area of the Facility stretching from the batch plant to the storm water basin, as well as pooled water discharging from the Facility at Discharge Point 1.

168.   A City of Escondido inspection report dated January 28, 2020 and accompanying photographs showing evidence of pollutant track out confirm that the Facility's BMPs fail to achieve BAT/BCT and that the Facility continues to discharge pollutants in excess of EPA Benchmarks.

169.   Similar CEMEX facilities enrolled under the Industrial General Permit have conducted QSE sampling and their results indicate the presence of many of the aforementioned pollutants in their storm water, at times in concentrations orders of magnitude higher than the Benchmarks and NALs. Some of these pollutants include but are not limited to, iron, zinc, copper, nitrogen and pH affecting substances. *See* Ex. 1 (SMARTS data for CEMEX facilities).

170.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation B.3 of the 1997 Permit and Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

171.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since June 2, 2015 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

### 3.   Discharges of Polluted Storm Water from the CEMEX Facility Violate IGP Receiving Water Limitations.

172.   Plaintiffs are informed, believe, and thereon allege that the CEMEX Facility has violated and continues to violate IGP Receiving Water Limitations.

173.   Plaintiffs are informed, believe, and thereon allege the Facility discharges elevated concentrations of several toxic metals in excess of CTR standards.

174.   Arsenic, mercury, copper, cadmium, nickel, lead, hexavalent chromium, selenium, and zinc are all toxic metals which are associated with concrete production,

175.   Receiving Waters downstream from the Facility are impaired, and thus unable to support the designated Beneficial Uses, for some of the same pollutants discharged by the Facility.

176.   According to the 2016 303(d) List of Impaired Water Bodies, both Escondido Creek and the San Elijo Lagoon are impaired for toxicity.

177.   Plaintiffs are informed, believe, and thereon allege the Facility's discharges of these toxic metals in excess of the CTR standards cause and/or contribute to the toxicity impairment of Escondido Creek and the San Elijo Lagoon.

178.   Images, photos, and descriptions of the Facility's basins and sumps indicate that the Facility's retention capacity is small or modest relative to the size of the Facility, and the 2020 SWPPP fails to state the 48-hour drawn-down capabilities of the Facility.

179.   On April 10, 2020, Coastkeeper observed the Facility's northwestern basin overflow and discharge commingled storm water from Discharge Point 1.

180.   Plaintiffs are informed, believe, and thereon allege the Facility storm water and non-storm water discharges contain elevated concentrations of TSS in excess of the Basin Plan Water Quality Objective and cause and/or contribute to the impairment of Escondido Creek in violation of the Receiving Water Limitations of the IGP.

181. The Basin Plan sets forth a narrative standard for TSS mandating that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Milky, muddy, discolored discharges indicate high concentrations of TSS.

182. According to the 2016 303(d) List of Impaired Water Bodies, Escondido Creek is impaired for benthic community effects. The Basin Plan explains that "[s]uspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." Basin Plan at 3-31.

183. Escondido Creek is impaired, and thus unable to support these designated beneficial uses, for some of the very pollutants likely found in the Facility's discharges, including nitrogen, phosphorus, selenium, and total dissolved solids.

184. The Creek is further impaired for manganese, which also impacts the municipal & domestic supply beneficial use.

185. The Facility's storm water discharges containing elevated concentrations of total dissolved solids, nitrogen, phosphorus and manganese in excess of respective Basin Plan Water Quality Objectives cause and/or contribute to the benthic community effects impairments of Escondido Creek in violation of the Receiving Water Limitations of the IGP.

186. Plaintiffs are informed, believe, and thereon allege that discharges of elevated concentrations of pollutants from the CEMEX Facility also adversely impact human health, thus violating the Permit Receiving Water Limitation C.1 of the 1997 Permit, and VI.B of the 2015 and 2020 Permits.

187. Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

/././

188.   Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

189.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since June 2, 2015 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.    Defendant Has Violated and Continues to Violate IGP SWPPP Requirements.**

190.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

191.    Plaintiffs are informed, believe, and thereon allege that the Facility's site map and description of the Facility's drainage areas are inconsistent and/or inaccurate in violation of the IGP.

192.   The site map and Section 4.1 of the 2020 SWPPP state the Facility consists of one drainage area and one discharge location, Discharge Point 1. However, the same section of the SWPPP states storm water that falls in the "northeast portion" of the Facility collects around the batch plant, storm water that falls in the "northwest portion" flows into a basin, and storm water that falls in the "southern portion" flows to the wash out area. Thus, the 2020 SWPPP indicates that there are likely three separate drainage areas within the Facility.

193.   Though the 2020 SWPPP states that when the northwestern basin is overwhelmed, storm water is discharged from the Facility, the SWPPP fails to indicate where storm water flows when either the northeast or southern portions of the Facility are overwhelmed.

194.   The Facility site map indicates that there are washout areas located within the northeast and southern "portions" of the Facility. Therefore, the northeast and southern "portions" of the Facility also discharge commingled storm water or these

drainage areas flow into, and commingle with storm water in the northwestern basin. As a result, the Facility site map and SWPPP are inaccurate and/or incomplete, and the Facility discharges commingled process, wash, and storm water, in violation of the IGP.

195.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a SWPPP that contains BMPs to adequately prevent the exposure of pollutants to storm water, commingling of process and wash water with storm water, and the subsequent discharge of pollutants from the Facility, as required by the IGP.

196.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a SWPPP that includes an adequate pollutant source assessment.

197.   Though the 2020 SWPPP acknowledges the Facility operates a concrete batch plant, and that pollutants from aggregate, fly ash, and cement can affect storm water discharges due to the handling, tracking, and fugitive dust emissions from such materials, the SWPPP claims that the only pollutants present at the Facility associated with its industrial operations are TSS, O&G, pH, and iron.

198.   Numerous harmful, toxic, and carcinogenic pollutants are present in these materials, particularly in fly ash and cement dust. Fly ash can contain lead, arsenic, mercury, and cadmium. Cement dust in the United States commonly contains mercury, copper, chromium, hexavalent chromium, cadmium, nickel, manganese, lead, and iron.

199.   The Facility's own 2016–2017 and 2017–2018 Annual Reports indicate nitrogen is present at the Facility, and nitrogen is not included in the SWPPP's pollutant source assessment. The failure of the SWPPP to assess or acknowledge these pollutants is particularly egregious as many of these pollutants are considered toxic.

200.   Publicly available images, photos and inspection reports from the City of Escondido, and direct observations by Coastkeeper and CERF all demonstrate that pollutants are regularly tracked throughout the Facility and off the Facility through ingress and egress. *See* 2015 Permit § X.H.1.

201.   On April 10, 2020, a Coastkeeper representative observed water pooled throughout much of the northern part of the Facility, stretching from the batch plant to the retention basin, and pooled water discharging from the Facility at Discharge Point 1.

202.   According to the 2020 SWPPP, pollutants are "tracked out onto paved road." 2020 SWPPP § 8.1.2.

203.   A recent inspection conducted by the City of Escondido on January 28, 2020 found that the Facility had discharged cement into the street via truck or trucks, and specifically noted that this violated outdoor operation BMPs.

204.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed to develop and/or implement BMPs that adequately: minimize the exposure of pollutants to storm water at the Facility; control and minimize polluted runoff from the Facility; treat and remove pollutants in storm water prior to discharge; prevent or control contaminated storm water from being discharged from the Facility; prevent or control contaminated NSWDs from being discharged from the Facility.

205.   Plaintiffs are informed, believe, and thereon allege that the Facility SWPPP fails to adequately analyze the effectiveness of the Facility's existing BMPs.

206.   Plaintiffs are informed, believe, and thereon allege that the inadequacy of the BMPs at the CEMEX Facility is in part a result of Defendant's failure to develop, implement, and revise an adequate SWPPP.

207.   Plaintiffs are informed, believe, and thereon allege that Defendant's failure to adequately revise the Facility's SWPPP, and thus failure to improve the Facility's BMPs ensures that the Facility will continue to operate in violation of the IGP.

**E.    Defendant Has Failed to Develop, Implement, and/or Revise Adequate Monitoring Implementation Plan at the CEMEX Facility.**

208.   Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

*/./.*/

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES     30

209. Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement a MIP that ensures the collection of storm water samples from all discharge locations at the Facility in violation of Section XI.B.4 of the 2015 and 2020 Permits.

210. Section XI.B.4 of the 2015 and 2020 Permits specifically require dischargers to collect samples "from each drainage area at all discharge locations."

211. The Facility has not collected any storm water samples for at least the past five years.

212. The Facility SWPPP fails to state the Facility's storm water retention capacity, and 48-hour drawn-down capabilities. Plaintiffs are informed, believe, and thereon allege, based on publicly available images, photos, descriptions of the Facility's basins and sumps, and direct observations, the Facility's storm water retention capacity is small or modest relative to the Facility's acreage that is exposed to storm water.

213. A Coastkeeper representative observed discharges from the Facility's northwestern basin, at or near Discharge Point 1 during operating hours on April 20, 2020.

214. Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the IGP. The Facility analyzes its storm water samples for only TSS, O&G, pH, and iron.

215. The 2015 and 2020 Permits require Facility Owners and/or Operators to sample and analyze parameters on a Facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment. 2015 & 2020 Permit § XI.B.6.c.

216. The Facility's pollutant source assessment is deficient and in violation of the Permit as numerous pollutants such as mercury, copper, chromium, hexavalent chromium, cadmium, nickel, manganese, lead, arsenic, zinc, aluminum, selenium, nitrogen, and phosphorus are likely present at the Facility and associated with its

industrial activities. As a result, Defendant's failure to analyze samples for these parameters violates the IGP.

217.   The Facility handles fly ash and cement, which are pervasive throughout the site. 2020 SWPPP § 6.3; Table 3. "Industrial activities" include the movement of mobile equipment, which tracks pollutants, including fly ash and cement dust, throughout the Facility and off the Facility. The SWPPP acknowledges, "[c]ement dust is very fine and it is difficult to sweep up to a level that does not adversely impact storm water." 2020 SWPPP § 7.0.

218.   The Facility's 2016–2017 and 2017–2018 Annual Reports indicate nitrogen is present at the Facility, and nitrogen is not included in the SWPPP's pollutant source assessment.

219.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to collect the required number of storm water samples for each reporting period.

220.   The IGP requires dischargers to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs. Plaintiffs are informed, believe, and thereon allege, Defendant fails to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

**F.   Defendant Has Violated the IGP's Reporting Requirements.**

221.   Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

222.   The Facility's 2015–2016, 2016–2017, 2017–2018, and 2018–2019 Annual Reports claim that the Facility failed to collect the requisite number of storm water samples due to a lack of qualifying discharges during business hours.

223.   The Annual Reports' claims lack of qualifying discharges during business hours are directly contradicted by Coastkeeper's observations on Friday April 10, 2020, at approximately 9:55 a.m., during which the Facility's gates were open, and the Facility was actively discharging water from Discharge Point 1.

224.    Historical precipitation data indicates that numerous QSEs and sequential storm events occurred in the past five years during business hours. *See* Ex. 1. Plaintiffs are informed, believe, and thereon allege many of these storm events caused discharges during Facility operating hours.

225.    In light of the foregoing, Plaintiffs are informed, believe, and thereon allege the Defendant has falsified information on numerous Annual Reports.

226.    In each Annual Report since the filing of the 2015–16 Annual Report, Defendant certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance.

227.    Plaintiffs are informed, believe and thereon allege the Annual Report certifications are erroneous, and the Facility's Environmental Manager, Patricia Contreras, who certified these Annual Reports, knew or should have known that the assertion that the Facility had not discharged storm water during operating hours at any point for the past five years was a false statement.

228.    Plaintiffs are informed, believe, and thereon allege the Facility's SWPPPs do not include many elements required by the IGP, and Defendant's certification to the contrary constitutes a violation of the IGP and CWA.

229.    Facility operators must report any noncompliance with the IGP at the time that the Annual Report is submitted, including (1) a description of the noncompliance and its cause, (2) the period of noncompliance, (3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and (4) steps taken or planned to reduce and prevent recurrence of the noncompliance. 1997 Permit, § C.11.d; 2015 & 2020 Permit, § XVI.B.2.

230.    Plaintiffs are informed, believe, and thereon allege that Defendant has failed to report numerous instances of non-compliance required by the IGP.

/./.

## V.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

231.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

232.   Plaintiffs are informed and believe, and thereon allege that prohibited non-storm water discharges have and continue to discharge from the Facility. Defendant's ongoing failure to prevent unauthorized non-storm water discharges is a violation of the IGP and the CWA. 1997 Permit § A.1; 2015 & 2020 Permit § III.B; 33 U.S.C. § 1311(a).

233.   Defendant violated and will continue to violate the IGP Discharge Prohibition each and every time unauthorized non-storm water discharges from the Facility.

234.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section A.2 of the 1997 Permit, and Section III.C of the 2015 and 2020 Permits.

235.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the 2015 and 2020 Permits.

236.   Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibition at the Facility every day from June 2, 2015 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

/././

237. Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 2, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

238. Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

239. Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

240. Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

241. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 1997 Permit § B.3; 2015 Permit § I.D.32, V.A; 2020 Permit § V.A; *see also* 33 U.S.C. § 1311(b).

242. Defendant violated and continues to violate the IGP Effluent Limitation each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

243. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitation at the Facility every day from June 2, 2015, to the present. Plaintiffs are informed, believe, and thereon allege Defendant's

violations of the IGP Effluent Limitation and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

244.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

245.   Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since June 2, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### THIRD CAUSE OF ACTION
**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

246.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

247.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

248.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

249.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

/./.

250.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

251.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 1997 Permit §§ C.1–2; 2015 & 2020 Permit §§ VI.A–B; 33 U.S.C. § 1311(b).

252.   Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

253.   Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

254.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

255.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

256.   Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since June 2, 2015. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since June 2, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/././

/././

/././

## FOURTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

257.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

258.   Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

259.   Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

260.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § A; 2015 & 2020 Permit § X; *see also* 33 U.S.C. § 1311(b).

261.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from June 2, 2015, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

262.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

263.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since June 2, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/././

/././

/././

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

264.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

265.    Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

266.    Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 1997 Permit § B; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

267.    Defendant has been in violation of the IGP MIP requirements every day from June 2, 2015, to the present. Defendant's violations of the IGP MIP requirements and the CWA at the Facility are ongoing and continuous.

268.    Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

269.    Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 2, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

270.    Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

271.   Plaintiffs are informed and believe, and thereon allege Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

272.   The Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 1997 Permit §§ B.14, C.9–10; 2015 & 2020 Permit § XVI; *see also* 33 U.S.C. § 1311(b).

273.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least June 2, 2015. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

274.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

275.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 2, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

276.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

277.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility. Defendant's failure to conduct the requisite visual observations at the Facility is a violation of the IGP and the CWA. *See* 1997 Permit §§ B.3–4; 2015 & 2020 Permit § XI.A; *see also* 33 U.S.C. § 1311(b).

278.   Defendant has failed to collect and analyze the required number of storm water samples the Facility. Defendant's failure to collect and analyze the required

number of storm water samples at the Facility is a violation of the IGP and the CWA. 1997 Permit §§ B.5.a–b, 2015 Permit & 2020 Permit §§ XI.B.1–3; 33 U.S.C. § 1311(b).

279.   Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 1997 Permit §§ B.5.c, B.6; 2015 & 2020 Permit § XI; *see also* 33 U.S.C. § 1311(b).

280.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since June 2, 2015. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

281.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

282.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since June 2, 2015. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VI.   RELIEF REQUESTED

283.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant to have violated and to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and receiving water limitations, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

/././

1     c.     A court order requiring Defendant to implement affirmative injunctive

2 measures designed to eliminate Defendant's violations of the substantive and procedural

3 requirements of the IGP and the Clean Water Act;

4     d.     A court order assessing civil monetary penalties for each violation of the

5 CWA at $37,500.00 per day per violation for all CWA violations after January 12, 2009,

6 and $55,800.00 per day per violation for violations that occurred after November 2, 2015,

7 as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil

8 Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

9     e.     A court order awarding Plaintiffs their reasonable costs of suit, including

10 attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

11 Water Act, 33 U.S.C. § 1365(d); and

12     f.     Any other relief as this Court may deem appropriate.

13 Dated: August 25, 2020

Respectfully submitted,

COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

SAN DIEGO COASTKEEPER
By: s/Matt O'Malley
MATT O'MALLEY
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: matt@sdcoastkeeper.org